1
2
3
4
5
6
7
8
9
10
11
12
13
14

FILED
CLERK, U.S. DISTRICT COURT

APR 21 2008

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA-WESTERN DIVISION

| | |
|---|---|
| 15  JESUS RUIZ, | ) CV 07-04227-AHS (SH) |
| 16 | ) |
|           Petitioner, | ) ORDER ADOPTING THE |
| 17 | ) REPORT AND RECOMMENDATION |
|      v. | ) OF UNITED STATES MAGISTRATE |
| 18 | ) JUDGE |
| 19  ROBERT A. HOREL, Warden | ) |
| | ) |
| 20            Respondent. | ) |

Pursuant to 28 U.S.C. Section 636(b)(1)(C), the Court has reviewed the Petition, all of the records and files herein and the attached Report and Recommendation of the United States Magistrate Judge, and has made a <u>de novo</u> determination of the Report and Recommendation. The Court concurs with and adopts the conclusions of the Magistrate Judge.

IT IS ORDERED that the Petition filed herein is dismissed with prejudice.

1

1    IT IS FURTHER ORDERED that the Clerk shall serve copies of this Order,

2  the Magistrate Judge's  Report and Recommendation and the Judgment herein by

3  the United States mail on petitioner and counsel for respondent.

4    LET JUDGMENT BE ENTERED ACCORDINGLY.

5  DATED: _____APR 2 1 2008_____

6

7

8    _____

9    ALICEMARIE H. STOTLER
     CHIEF UNITED STATES DISTRICT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2



FILED
CLERK U.S. DISTRICT COURT

FEB – 7 2008

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| JESUS RUIZ,<br><br>　　　　　Petitioner,<br><br>　　v.<br><br>ROBERT A. HOREL, Warden,<br><br>　　　　　Respondent. | ) No. CV 07-04227-AHS (SH)<br>)<br>) REPORT AND RECOMMENDATION OF<br>) UNITED STATES MAGISTRATE JUDGE<br>)<br>)<br>)<br>)<br>)<br>) |

This Report and Recommendation is submitted to the Honorable Alicemarie H. Stotler, Chief United States District Judge, pursuant to 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California.  For the reasons stated below, the petition for a writ of habeas corpus should be denied.

## I.  **PROCEEDINGS**

Petitioner, a prisoner in the custody of the California Department of Corrections, challenges a conviction in California Superior Court, Los Angeles County (Case No.

YA055202).

On June 27, 2007, petitioner filed a Petition for Writ of Habeas Corpus by a Person in State Custody ("Petition") herein. After receiving extensions of time, respondent filed an Answer to the Petition on October 24, 2007. Petitioner did not file a Reply to the Return, or request an extension of time to do so.

Thus, this matter now is ready for decision.

## II. **PROCEDURAL HISTORY**

On February 3, 2004, a Los Angeles Superior Court jury found petitioner guilty of two counts of attempted murder (Counts 1 and 2), one count of unlawful driving or taking of a vehicle (Count 3), and one count of unlawful firearm activity (Count 4). In addition, the jury found true the special allegations that the attempted murders were committed willfully, deliberately and with premeditation; that, in the commission of the attempted murders, petitioner personally inflicted great bodily injury, personally and intentionally discharged a firearm, i.e., a handgun, which caused great bodily injury, personally and intentionally discharged a firearm, i.e., a handgun, personally used a firearm, i.e., a handgun; and that all offenses were committed for the benefit of, or at the direction of, or in association with a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by gang members. (Clerk's Transcript ["CT"] 228-30; 6 Reporter's Transcript ["RT"] 956-62). On February 18, 2004, after granting the prosecution's motion to dismiss a prior "strike" allegation, the trial court sentenced petitioner to state prison for eighty-eight years and eight months to life in state prison. (CT 278-82, 289-90; 6 RT 971, 991-1001).[1]

---

[1]     Petitioner's sentence consisted of the following: with respect to the attempted premeditated murder conviction (Count 1), a consecutive term of 15 years to life, plus 25 years to life for the finding that petitioner personally used a firearm which caused bodily injury, plus stayed terms for the other personal firearms use findings; with respect to the attempted murder conviction (Count 2), a consecutive term of 15 years to life, plus 25 years to life for the finding that petitioner personally used a firearm which
(continued...)

Petitioner (and his co-defendant) appealed their convictions to the California Court of Appeal, wherein petitioner alleged <u>inter alia</u> the same claims as the first through fourth claims alleged in the Petition herein. (<u>See</u> Respondent's Notice of Lodging of Documents ["Lodgment"] "A"-"F"). In an unpublished opinion issued on December 20, 2005, the California Court of Appeal modified the judgment to stay the term imposed on the unlawful driving or taking of a vehicle conviction, and to strike the great bodily injury enhancements for the attempted murders; remanded the matter to permit the trial court to resentence petitioner with the unlawful firearm activity conviction as the base term; and affirmed the judgment in all other respects. (<u>See</u> Lodgment "G").

Petitioner (and his co-defendant) filed Petitions for Review with the California Supreme Court (petitioner alleged <u>inter alia</u> the same claims as the first through fourth claims alleged in the Petition herein). (<u>See</u> Lodgment "H"). On April 12, 2006, the California Supreme Court denied the Petitions for Review without prejudice to any relief to which petitioner and his co-defendant would be entitled after the California Supreme Court decided <u>People v. Cage</u>[2] or after the United States Supreme Court determined in <u>Cunningham v. California</u>[3] the effect of <u>Blakely v. Washington</u>, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) and <u>United States v. Booker</u>, 543 U.S. 220, 15 S.Ct. 738, 160 L.Ed.2d 621 (2005) on California sentencing law. (<u>See</u> Lodgment "J").

Petitioner subsequently filed a petition for writ of habeas corpus in the Los Angeles Superior Court, wherein he alleged the same claims as the fifth and sixth claims alleged in the Petition herein. (<u>See</u> Lodgment "K"). On May 11, 2006, the Superior Court denied that habeas petition. (<u>See</u> Lodgment "L").

---

[1] (...continued) caused great bodily injury, plus stayed terms for the other personal firearm findings; with respect to the unlawful driving or taking of a vehicle conviction (Count 3), three years, plus for years for the criminal street gang finding; and with respect to the unlawful firearm activity conviction (Count 4), a consecutive term of eight months, plus one year for the criminal street gang finding.

[2]     40 Cal.4th 965, 155 P.3d 205, 56 Cal.Rptr.3d 789 (2007).

[3]     549 U.S. __, 127 S.Ct. 856, 166 L.Ed.2d 856 (2007).

Petitioner then filed a habeas petition with the California Court of Appeal, alleging the same claims as the fifth and sixth claims alleged in the Petition herein. (See Lodgment "M"). On November 6, 2006, the California Court of Appeal denied that habeas petition. (See Lodgment "N").

Petitioner then filed a habeas petition with the California Supreme Court, wherein he alleged the same claims as the fifth and sixth claims alleged in the Petition herein. (See Lodgment "O"). On June 13, 2007, the California Supreme Court summarily denied that habeas petition without citation of authority. (See Lodgment "P").

The instant Petition followed.

## III.  FACTUAL BACKGROUND

1.  The prosecution's case

At approximately 6:00 p.m., Odber Morales ("Morales")[4] and Carlos Aguilar ("Aguilar"), both Tepa 13 gang members, were walking down Freeman Street and 106th Street, when Morales heard shots. The Tepa 13 gang was not friendly with the Lennox 13 gang. Frightened by the shots, Morales began to run. Morales was shot once in the arm. Morales ran to a friend's house, and then was taken to a hospital for treatment. (See 4 RT 524-29, 539-40, 543; 5 RT 584, 738, 764-65).

A little after 6:00 p.m., Salvador Reynoso ("Reynoso") and Jaime Mendoza were working under the hood of a car near the corner of Ravenswood and 106th Street in Lennox. Reynoso heard at least four successive "pops" that sounded like gunfire coming from the same direction. Reynoso looked over the hood and saw a small, red foreign car approaching them on 106th Street. Two Hispanic men were in the front seat, with their windows open. The passenger, holding a gun in his right hand, pulled his arm back inside the window. The two men laughed as they made a right turn on Ravenswood and

---

[4]     During cross-examination, Detective Hernandez testified that during interviews Morales and Aguilar denied gang membership (but that Morales ultimately admitted to associating with Tepa gang members). (See 5 RT 736-38).

4

1   drove away.  (See 4 RT 430-37, 443-44, 449, 474, 478-79; 5 RT 594).[5]

2         Reynoso saw Juan [Carlos] Aguilar ("Aguilar") lying on the sidewalk and another

3   man running in pain.  Reynoso told the Aguilar to stay down and then called 911.  The

4   second man (late teens, early 20's), who appeared to have been shot in the upper body,

5   left the scene.  (See 4 RT 434-35, 437-39, 460-61, 474-76, 554-55).

6         Shortly after 6:00 p.m., Los Angeles County Sheriff's Department Deputies Andy

7   Ruiz and Michael Jones received a radio call about a shooting.  They drove to the

8   location and found Aguilar lying on the sidewalk.  Aguilar had suffered a gunshot wound

9   to the knee (the bullet had lodged in the calf of his other leg).  Aguilar told Deputy Ruiz

10  that Aguilar was walking with a friend on 106th Street when two Hispanic men in a red

11  compact car drove by, that the passenger asked them what barrio they were from and

12  then fired two to three shots at them, and that Aguilar's friend ran eastbound on 106th

13  Street.  The police recovered an expended bullet and a .380-caliber semiautomatic-type

14  shell casing at the scene.  (See 4 RT 553-61; 5 RT 596-97, 605-06, 609-10).  When the

15  police interviewed Morales in the hospital approximately a half an hour later, Morales,

16  who had suffered a gunshot wound to the elbow, said that he was walking with a friend

17  on 106th Street when two Hispanic men in a red vehicle drove by and fired two or three

18  shots at him.  (See 4 RT 561-63; 5 RT 607-08).

19        Shortly after 6:00 p.m., Los Angeles County Sheriff's Department Deputy

20  Christopher Maurizi received a radio call about a possible drive-by shooting by two male

21  Hispanics in a red compact Nissan.  Approximately one minute later, Deputy Maurizi

22  saw a red compact Nissan make a left turn from Century Boulevard onto Condon

23  Avenue.  As Deputy Maurizi approached from the opposite direction, the red car, with

24  two occupants, came to a stop in front of 10015 Condon Avenue.  Luis Vasquez

25  ("Vasquez") exited from the driver's side, and petitioner exited from the passenger's

26

27         [5]      During cross-examination, Reynoso testified that he could not see clearly
    inside the car, that he did not see the shots being fired and that he did not know if all the
28  shots were fired from the individuals in the red car.  (See 4 RT 454-55, 465).

1   side.  Deputy Maurizi got out of his vehicle and told Vasquez and petitioner to stop.[6]

2   After making eye contact with Deputy Maurizi for ten to fifteen seconds, Vasquez and

3   petitioner turned around and began to run away.  Vasquez was wearing a white T-shirt

4   and a pair of gray sweats.  Petitioner was wearing white T-shirt and dark pants.  (See 4

5   RT 481-86, 492-93, 500-01, 519, 521-22).  Fifteen to twenty minutes after the shooting,

6   the police were driving Reynoso (and a friend) in a police car, when Reynoso saw the red

7   car on Condon Avenue.  (See 4 RT 440-42; 5 RT 598-99).

8        Vasquez and petitioner ran towards a car wash on Century Boulevard.  Deputy

9   Maurizi pursued them on foot.  After running through the car wash, Vasquez and

10  petitioner scaled a fence, ran across Dalerose Avenue towards a place between two

11  buildings, and then scaled another fence.  At that point, Deputy Maurizi stopped running,

12  decided to maintain visual contact with Vasquez and petitioner, and called for backup

13  assistance.  Vasquez and petitioner began to run westbound towards Inglewood Avenue.

14  Vasquez attempted to scale a gate.  His left foot or ankle became entangled at the top of

15  the gate, and he fell onto the other side.  Vasquez got up and ran southbound into the rear

16  of a Traveler's Inn Motel parking lot on Inglewood Avenue.  (The motel was located

17  approximately one and a half miles from Ravenswood and 106th Street.)   Petitioner ran

18  to Inglewood Avenue, and then ran southbound.  Deputy Maurizi lost sight of both

19  Vasquez and petitioner.  (See 4 RT 486-95, 504-05).

20       The police, with the use of a police dog, found a tennis shoe, a sock and several

21  drops of blood, in the northern part of the Traveler's Inn parking lot (near the fence), and

22  followed the trail of blood to a room at the motel.  The door and attic of the room were

23  open.  Vasquez and petitioner were found hiding in the attic of the room.  After the

24  police ordered the men out, Vasquez, wearing only a pair of boxer shorts and one sock,

25  surrendered.  Vasquez had a large laceration near his ankle or calf.  Petitioner initially

26  refused to surrender, repeatedly saying, "Fuck you.  I'm not coming out."  It appeared

27

28        [6]   In his police report, Deputy Maurizi wrote that when Vasquez and petitioner
     exited the car they began to walk towards the house.  (See 4 RT 520).

1  that petitioner was holding a small caliber semiautomatic pistol in his outstretched hand.[7]

2  After approximately a thirty minute standoff, the SWAT team was called in.  After

3  petitioner continued to refused to surrender, tear gas was sent into the attic, and

4  petitioner eventually came out of the room.  Vasquez and petitioner were arrested.  In a

5  field lineup, Deputy Maurizi identified Vasquez and petitioner.  (See 4 RT 494-95, 501,

6  522, 565-66; 5 RT 615-29).

7       The police searched the attic and recovered two white shirts, a pair of dark pants, a

8  handwritten letter, seven live .380-caliber bullets, and a lighter.  The clothes had

9  bloodstains on them.  (See 4 RT 566-70; 5 RT 575-80, 606).  Six of the seven live bullets

10  were stamped "Fiocchi."  (See 5 RT 673-74).

11       In the vacant lot north of the motel, the police recovered a loaded .32-caliber

12  revolver with four live rounds and two expended shell casings in the cylinder.[8]  Near the

13  fence north of the motel, the police recovered a black "slip on type" shoe, a bloody sock,

14  and a piece of material matching the torn pants found in the attic.  (See 5 RT 638-47,

15  653-56).

16       The police searched the red car (a Nissan Sentra) and recovered a "Fiocchi" .380-

17  caliber expended shell casing on the driver's side floorboard and a beer can containing

18  fingerprints.  (See 5 RT 605-06, 613, 649-53).  The fingerprints belonged to Vasquez.

19  (See 5 RT 692-93).  The police found a "shaved" key in the ignition of the car.  (See 5

20  RT 730-32).

21       A criminalist testified that the expended bullet recovered from the crime scene had

22  been fired from the revolver recovered in the vacant lot.  (The revolver was an 8 mm

23  revolver that can fire .32-caliber, but not .380-caliber, bullets.)  The criminalist testified

24  that the .380-caliber shell casing recovered from the crime scene and the .380-caliber

25  shell casing recovered from the car had been fired by the same weapon (not the

26

27  [7]  No semiautomatic pistol was recovered from the attic.  (See 5 RT 630, 748).

28  [8]  No fingerprints were lifted from the revolver.  (See 5 RT 732).

7

revolver).  The criminalist opined that the expended cartridge found in the red car most likely was discharged in the car or within a couple of feet of it.  (See 5 RT 660, 663-72, 681-83).

In a tape-recorded conversation at the jail on June 19, 2003, Vasquez spoke to Maria Gutierrez about a cut he sustained on his leg while he was jumping over fence as he was being chased by the police.  During the conversation, Vasquez said, "They told me they found the gun."  After Ms. Gutierrez made an unintelligible statement, Vasquez lowered his voice and said, "There were two guns."  When Ms. Gutierrez asked a question, Vasquez responded, "My thing has my prints on it."  (See 5 RT 732-35).[9]

The parties stipulated that on May 22, 2003, at approximately 11:50 a.m., the red car was reported stolen from a location in Los Angeles County, and neither Vasquez nor petitioner had permission to take or drive the car.  (See 5 RT 691, 700).

Los Angeles County Sheriff's Detective Ralph Hernandez testified as a gang expert.  Both Vasquez (whose moniker was "Santos") and petitioner (whose moniker was "Little Bullet") had admitted being members of the gang Lennox 13 and had associated with Lennox 13 members.  Petitioner had a "Lennox" tattoo on his back and a "LNX" tattoo under his left eye.  Lennox 13 members committed crimes including simple graffiti, burglary, robberies, witness intimidation, assaults, shootings and murder.  Such crimes were committed to gain respect in the gang.  A shooting committed in broad daylight would garner even more respect.  Stolen cars are commonly used in drive-by shootings since they are more difficult to trace to a suspect.  Hawthorne Boulevard separates the territories of Lennox 13 and its main rival, Tepa 13.  The shooting at issue took place in a territory claimed by Tepa 13.  Numerous Tepa 13 gang members live or have lived on the block, and consequently other gang members are attracted to and congregate on that block.  (See 5 RT 701-03, 711-25).

Assuming that two Lennox 13 gang members armed with handguns drove to the

---

[9]     The evidence about the phone call was limited to the case against Vasquez. (See 5 RT 734-35).

8

1   location in a stolen car, fired shots at two Hispanics, drove away laughing, were seen in

2   the car about a mile away, and were found together in an attic, Detective Hernandez

3   opined that the two gang members went there with the intent to kill a rival gang member

4   and with the purpose of furthering the violent reputation of their gang.  Planning was

5   shown by the use of a stolen vehicle.  Detective Hernandez testified that the shooting

6   likely did not take place in self-defense, given, among other things, the stolen vehicle

7   driven into a rival gang's territory, the laughter by the shooters, the recovered evidence

8   of the bullets, casings and revolver, and the lack of bullet holes on the red car.  (See 5

9   RT 725-26, 775-77).  Detective Hernandez testified about murder convictions suffered

10  on March 14, 2003 and July 23, 2003 by two other Lennox 13 members.  (See 5 RT 726-

11  29).

13  2.    Petitioner's defense case

14      No witnesses testified for the defense.  (See 5 RT 784, 787).

16              **IV.  PETITIONER'S CLAIMS**

17  1.    The trial court improperly admitted evidence of Carlos Aguilar's statement to a

18      police officer as a spontaneous declaration.  (Petition at 6, Attachment No. 3 at 8-

19      13).

21  2.    The evidence was insufficient to support the findings that the attempted murders

22      were willful, deliberate and premeditated.  (Petition at 6, Attachment No. 3 at 14-

23      16).

24  3.    The evidence was insufficient to support the unlawful taking or driving of a

25      vehicle conviction.  (Petition at 7, Attachment No. 3 at 17-18).

26  4.    The trial court erred in staying (rather than striking) the additional firearm

27      enhancements.  (Petition at 7, Attachment No. 3 at 19-21).

28  5.    Petitioner received ineffective assistance of counsel based on his trial counsel's

failure to challenge the jury venire consisting of an under-representation of Hispanic-Latino potential jurors. (Petition at 7, Attachment No. 4 at 15-18).

6.    Petitioner received ineffective assistance of counsel based on his appellate counsel's failure to request the venire jurors' questionnaires to identify potential jurors' surnames. (Petition at 8, Attachment No. 4 at 18-19).

## V. **STANDARD OF REVIEW**

The standard of review applicable to petitioner's claims herein is set forth in 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

> "An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings."

Moreover, a state court factual determination must be presumed correct unless rebutted by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1)(as amended).

Under the AEDPA, the term "clearly established Federal law" means "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 71-72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003); see also Williams v. Taylor, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) ("clearly established Federal law" consists of holdings, not dicta, of Supreme Court decisions "as of the time of the relevant state-court decision"). However, federal circuit law may still be persuasive authority in identifying

1  "clearly established" Supreme Court law or in deciding when a state court unreasonably

2  applied Supreme Court law.  See Tran v. Lindsey, 212 F.3d 1143, 1154 (9th Cir.), cert.

3  denied, 531 U.S. 944 (2000).

4       Although a particular state court decision may be both "contrary to" and "an

5  unreasonable application of" controlling Supreme Court law, the two phrases have

6  distinct meanings.  Williams, supra, 529 U.S. at 391, 413.  A state court decision is

7  "contrary to" clearly established federal law if the decision applies a rule that contradicts

8  the governing Supreme Court law or reaches a result that differs from a result the

9  Supreme Court reached on "materially indistinguishable" facts.  Early v. Packer, 537

10  U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam); Williams, supra, 529 U.S.

11  at 405-06.  However, the state court need not cite the controlling Supreme Court cases,

12  "so long as neither the reasoning nor the result of the state-court decision contradicts

13  them."  Early, supra.

14       A state court decision involves an "unreasonable application" of clearly

15  established federal law if "the state court identifies the correct governing legal principle

16  from [Supreme Court] decisions but unreasonably applies that principle to the facts of

17  the prisoner's case."  Williams, supra, 529 U.S. at 413; Woodford v. Visciotti, 537 U.S.

18  19, 24-27, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam).  A federal habeas court

19  may not overrule a state court decision based on the federal court's independent

20  determination that the state court's application of governing law was incorrect, erroneous

21  or even "clear error."  Lockyer, supra, 538 U.S. at 75.  Rather, a decision may be rejected

22  only if the state court's application of Supreme Court law was "objectively

23  unreasonable."  Id.; Woodford, supra; Williams, supra.

24       When a state court decision is found to be contrary to or an unreasonable

25  application of clearly established Supreme Court law, a federal habeas court "must then

26  resolve the [constitutional] claim without the deference AEDPA otherwise requires."

27  Panetti v. Quarterman, 127 S.Ct. 2842, 2858, 166 L.Ed.2d 682 (2007); see also Williams,

28  supra, 529 U.S. at 406 (when a state court decision is contrary to controlling Supreme

Court law, a federal habeas court is "unconstrained by § 2254(d)(1)"). In other words, if a § 2254(d)(1) error occurs, the constitutional claim raised must be considered *de novo*. Frantz v. Hazey, __ F.3d __, 2008 WL 170323, *6-*8 (9th Cir. 2008); see also Rompilla v. Beard, 545 U.S. 374, 390, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005).

The same standard of objective unreasonableness applies where the petitioner is challenging the state court's factual findings under 28 U.S.C. § 2254(d)(2). See Buckley v. Terhune, 397 F.3d 1149, 1154 (9th Cir. 2005); Bruce v. Terhune, 376 F.3d 950, 954 (9th Cir. 2004); Taylor v. Maddox, 366 F.3d 992, 999 (9th Cir.), cert. denied, 125 S.Ct. 809 (2004); Torres v. Prunty, 223 F.3d 1103, 1107-08 (9th Cir. 2000). A federal court first must undertake an "intrinsic review" of the state court's factfinding, which requires an examination of the state court's factfinding process and not its findings. Buckley, supra, 397 F.3d at 1154-55; Taylor, supra, 366 F.3d at 1000. "Intrinsic challenges to state-court findings pursuant to the 'unreasonable determination' standard come in several flavors, each presenting its own peculiar set of considerations." Taylor, supra, 366 F.3d at 1000-01 (listing, e.g.: "where the state court should have made a finding of fact but neglected to do so[;] ... where the state court does make factual findings, but does so under a misapprehension as to the correct legal standard[;] ... and, where the fact-finding process itself is defective."). If the state court's factfinding process survives the federal court's intrinsic review, or if the petitioner does not challenge the state court's factfinding process, the state court's factual findings are presumed correct unless rebutted by clear and convincing evidence. Buckley, supra, 397 F.3d at 1155.

///
///
///
///
///
///
///

12

# VI. DISCUSSION

A.   **Habeas relief is not warranted with respect to petitioner's insufficiency of the evidence claims.**

The California standard for determining the sufficiency of evidence to support a conviction has been held by the California Supreme Court to be identical to the federal standard enunciated by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). See People v. Johnson, 26 Cal.3d 557, 576, 606 P.2d 738, 162 Cal.Rptr. 431 (1980). Under this standard, the question is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, supra, 443 U.S. at 319. In making this determination, the reviewing court "must respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that the jury resolved all conflicts in a manner that supports the verdict." Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995); see also Jackson, 443 U.S. at 319, 324, 326.

In the second claim alleged in the Petition, petitioner contends that the evidence was insufficient to support the findings that the attempted murders were willful, deliberate and premeditated. (Petition at 6, Attachment No. 3 at 14-16). In the third claim alleged in the Petition, petitioner contends that the evidence was insufficient to support the unlawful taking or driving of a vehicle conviction. (Petition at 7, Attachment No. 3 at 17-18).

Each of petitioner's claims will be examined in turn. For the reasons discussed below, the Court finds and concludes that the California courts' rejection of petitioner's insufficiency of the evidence claims neither was contrary to nor involved an unreasonable application of clearly established federal law, as determined by the United States Supreme Court.

13

1.  <u>The evidence supports the findings that the attempted murders were willful, deliberate and premeditated.</u>

    a.    <u>Legal authority</u>

Under California law, an attempted killing is deliberate and premeditated only if the perpetrator acted "as a result of careful thought and weighing of considerations; as a deliberate judgment or plan; carried on cooly and steadily according to a preconceived design." <u>See</u> People v. Anderson, 70 Cal.2d 15, 26, 447 P.2d 942, 73 Cal.Rptr. 550 (1968). "In this context, 'premeditated' means 'considered beforehand,' and 'deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." People v. Mayfield, 14 Cal.4th 668, 767, 928 P.2d 485, 60 Cal.Rptr.2d 1, <u>cert. denied</u>, 522 U.S. 839 (1997). The process of premeditation and deliberation "does not require any extended period of time" and can take place quickly. <u>Id.</u>; People v. Perez, 2 Cal.4th 1117, 1127, 831 P.2d 1159, 9 Cal.Rptr.2d 577 (1992).

California applies a three-part test for determining the sufficiency of the evidence to support a finding of deliberation and premeditation: (1) the defendant's planning activity prior to the homicide; (2) the defendant's motive to kill, as gleaned from his prior relationship or conduct with the victim; and (3) the manner of the killing, from which it might be inferred the defendant had a preconceived design to kill. First degree attempted murder verdicts will typically be sustained when there is evidence of all three types, or at least extremely strong evidence of planning activity, or of motive to kill in conjunction with either planning or the manner of the killing. <u>Id.</u> at 26-27; People v. Welch, 20 Cal.4th 701, 758, 976 P.2d 754, 85 Cal.Rptr.2d 203 (1999), <u>cert. denied</u>, 528 U.S. 1154 (2000); People v. Herrera, 70 Cal.App.4th 1456, 1462, n.8, 83 Cal.Rptr.2d 307 (1999)(stating that the <u>Anderson</u> factors apply to the determination about whether there is sufficient evidence to support an attempted murder conviction); People v. Brito, 232 Cal.App.3d 316, 323, 283 Cal.Rptr. 441 (1991)(applying the <u>Anderson</u> factors to a claim that the evidence was not sufficient to support an attempted murder conviction).

14

   b.   California Court of Appeal decision

In rejecting petitioner's claim that the evidence was insufficient to support the verdicts that the attempted murders were willful, deliberate and premeditated, the California Court of Appeal reasoned as follows:

> "Here, expert testimony established Vasquez and [petitioner] were members of the Lennox 13 gang and that this gang had a long-standing violent rivalry with the Tepa 13 gang. Vasquez and [petitioner] obtained a stolen car and two loaded firearms, then drove to the heart of Tepa 13 territory where they fired multiple shots at close range at two unarmed pedestrians who were members of the rival Tepa 13 gang, then laughed as they drove away. This evidence reveals planning and motive and overwhelmingly supports the inference the shooting was not spontaneous or an accident but was the deliberate, willful and premeditated result of appellants' armed foray into the heart of rival gang territory." (Lodgment "G" at 10).[10]

   c.   Findings and conclusion

The Court concurs with the California Court of Appeal's reasoning and conclusion. It is not the function of the Court to reweigh the evidence presented at trial. See Jones v. Wood, 207 F.3d 557, 563 (9th Cir. 2000)("It is not enough that we might have reached a different result ourselves or that, as judges, we may have reasonable doubt.").

After considering the evidence presented at trial in the light most favorable to the prosecution, and resolving all conflicts in the evidence in the manner most favorable to the prosecution, the Court finds that a rational trier of fact could have found beyond a reasonable doubt that petitioner was guilty of willful, premeditated and deliberate

---

[10]   Under Ylst v. Nunnemaker, 501 U.S. 797, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991), it may be presumed that the California Supreme Court, by its silent denial of petitioner's Petition for Review raising the same claims, did not intend to change the California Court of Appeal's reasoned decision rejecting them. Ylst, 501 U.S. at 803-04.

1  attempted murders.

2      Planning activity was shown by the evidence presented at trial that petitioner and

3  Vasquez were members of a Lennox 13 gang whose rival was the Tepa 13 gang; that

4  petitioner and Vasquez obtained a stolen car and two loaded firearms; that petitioner and

5  Vasquez drove to the heart of Tepa 13 territory; that petitioner and/or Vasquez asked the

6  victims what barrio they were from; that petitioner and Vasquez shot the victims; and

7  that petitioner and Vasquez laughed as they drove away.  (See 4 RT 431-36, 524-26, 529,

8  563; 5 RT 660, 663-72, 681-83, 714-21, 725-26).

9      An inference that petitioner had a preconceived design to kill was shown by the

10  evidence presented at trial that petitioner and Vasquez carried loaded guns; asked the

11  victims where they were from; pointed the guns at the victims (both members of the Tepa

12  13 gang); and fired several times at the victims from close range and in rapid succession.

13  (See 4 RT 431-34, 474-76, 529, 539-40, 543, 563; 5 RT 606-08, 660, 663-72, 681-83,

14  691, 700, 725-26).

15      Even reviewing petitioner's claim de novo,[11] the Court (after considering the

16  evidence presented at trial in the light most favorable to the prosecution, and after

17  resolving all conflicts in the evidence in the manner most favorable to the prosecution)

18  finds and concludes that a rational jury could reasonably have found that the evidence

19  was sufficient to establish beyond a reasonable doubt that petitioner acted with

20  willfulness, premeditation and deliberation.

21  ///

22  ///

23  ///

24  ///

25

26      [11]    The Ninth Circuit has left open the question of whether insufficiency of the
evidence claims are to be resolved under the standard of review set forth in 28 U.S.C. §
27  2254(d), as amended by the AEDPA.  See Bruce v. Terhune, 376 F.3d 950, 957 (2004);
Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir.) (en banc), cert. denied, 543 U.S. 956
28  (2004).

1    2.    <u>The evidence supports the unlawful taking or driving of a vehicle</u>

2          <u>conviction.</u>

3          Petitioner contends there was insufficient evidence to support the unlawful taking

4    or driving of a vehicle conviction, based on the absence of evidence suggesting that he

5    had knowledge of the stolen nature of the vehicle or that he was with Vasquez when the

6    vehicle was stolen. (<u>See</u> Petition at 6; Attachment No. 3 at 17-18).

7

8          a.    <u>Legal authority</u>

9          "The elements necessary to establish a violation of section 10851 of the Vehicle

10   Code are the defendant's driving or taking of a vehicle belonging to another person,

11   without the owner's consent, and with specific intent to permanently or temporarily

12   deprive the owner of title or possession." <u>People v. Windham</u>, 194 Cal.App.3d 1580,

13   1590, 240 Cal.Rptr. 378 (1987). "Specific intent to deprive the owner of possession of

14   his car may be inferred from all the facts and circumstances of the particular case."

15   <u>People v. Clifton</u>, 171 Cal.App.3d 195, 200, 217 Cal.Rptr. 192 (1985). "The flight upon

16   detection or apprehension is sufficient to show specific intent to deprive the owner of

17   possession." <u>In re Robert V.</u>, 132 Cal.App.3d 815, 821, 183 Cal.Rptr. 698 (1982).

18

19         b.    <u>California Court of Appeal decision</u>

20         When petitioner raised this claim on direct appeal, the California Court of Appeal

21   rejected it, as follows:

22              "Here, Vasquez and [petitioner] were in possession of the vehicle within

23         hours of the time it was reported stolen and they used the car to commit a drive-by

24         shooting. The gang expert explained gang members use stolen vehicles to commit

25         crimes in order to avoid apprehension. Based on this testimony and the facts of

26         this case, the jury reasonably could find [petitioner] would not personally have

27         discharged a firearm from the red Nissan unless he had been assured by Vasquez,

28         the driver, that the vehicle was stolen and could not be traced to them. Because a

17

reasonable jury could thus conclude [petitioner] knew the car was stolen and that he aided and abetted its continued possession for use in the shooting, thereby depriving the owner of its use, [petitioner's] conviction of taking or driving a vehicle without the owner's consent withstands attack for sufficiency."
(Lodgment "G" at 11).

### c.   Findings and conclusion

The Court again concurs with the California Court of Appeal's reasoning and conclusion. At the time of the shootings, petitioner and Vasquez were in a stolen vehicle (see 5 RT 691, 700), thereby attempting to avoid being apprehended (see 5 RT 721). Soon after the shootings, petitioner and Vasquez (after exiting the vehicle) fled when an officer told them to stop. (See 4 RT 483-92). After considering the evidence presented at trial in the light most favorable to the prosecution and resolving all conflicts in the evidence in the manner most favorable to the prosecution, the Court finds that a rational trier of fact could have found beyond a reasonable doubt that petitioner was guilty of aiding and abetting in the unlawful driving or taking of a vehicle.

Even reviewing petitioner's claim de novo,[12] the Court (after considering the evidence presented at trial in the light most favorable to the prosecution, and after resolving all conflicts in the evidence in the manner most favorable to the prosecution) finds and concludes that a rational jury could reasonably have found that the evidence was sufficient to establish beyond a reasonable doubt that petitioner aided and abetted in the unlawful driving or taking of a vehicle.

---

[12]   The Ninth Circuit has left open the question of whether insufficiency of the evidence claims are to be resolved under the standard of review set forth in 28 U.S.C. § 2254(d), as amended by the AEDPA. See Bruce v. Terhune, 376 F.3d 950, 957 (2004); Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir.) (en banc), cert. denied, 543 U.S. 956 (2004).

1    **B.      Habeas relief is not warranted with respect to petitioner's evidentiary error**

2            **claim.**

3            Petitioner contends that the trial court improperly admitted evidence of Carlos

4    Aguilar's statement to a police officer as a spontaneous declaration.  Petitioner claims

5    that, because Aguilar was not available for cross-examination, the admission of

6    Aguilar's statement violated petitioner's Sixth Amendment right to confrontation.

7    Petition at 6, Attachment No. 3 at 8-13).[13]

8

9            1.    The record below

10           Prior to opening statements, the trial court held a hearing on the admission of

11   evidence of Aguilar's statement to an officer as a spontaneous declaration under

12   California Evidence Code § 1240.[14]  Deputy Ruiz testified that he and his partner

13   responded to the radio call and (within five minutes of the call) saw Aguilar lying on the

14   sidewalk.  Aguilar was clenching his wounded knee, was squinting his eyes, was gritting

15   his teeth, was concerned about his wound, and appeared to be in pain.  Deputy Ruiz

16   asked Aguilar his name and some questions in order to identify possible suspects.

17   Aguilar said he was walking westbound on 106th Street from Freeman Avenue when two

18   Hispanic men in a red compact car drove by, asked him what barrio he was from, and

19   fired two or three rounds at him (one of which struck his knee).  The conversation lasted

20   no more than five minutes.  (See 2 RT 3; 3 RT 365; 4 RT 392-98).

21           Following Deputy Ruiz' testimony, counsel for Vasquez stated he wanted to call a

22

23           [13]    To the extent that petitioner is alleging that the evidence was improperly
     admitted as a spontaneous declaration under California law, petitioner's claim is not
24   cognizable on federal habeas review.  See 28 U.S.C. § 2254(a); Estelle v. McGuire, 502
     U.S. 62, 67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); Smith v. Phillips, 455 U.S. 209,
25   221, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

26           [14]    California Evidence Code § 1240 provides that: "Evidence of a statement is
     not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate,
27   describe, or explain an act, condition, or event perceived by the declarant; and (b) Was
     made spontaneously while the declarant was under the stress of excitement caused by
28   such perception."

detective to testify about Aguilar's unavailability.  The prosecutor stated that Aguilar was not going to be called as a witness at trial.  After noting that the admission of a spontaneous declaration under § 1240 does not require unavailability, the trial court denied defense counsel's request.  After hearing argument, the trial court found that Aguilar's statements to Deputy Ruiz were reliable, spontaneous, and described an event.  The trial court therefore admitted Aguilar's statements as a spontaneous declaration.  (See 4 RT 407-13).

At trial, Deputy Ruiz testified that he and his partner responded to the radio call and saw Aguilar on the sidewalk with a gunshot wound in the knee.  Aguilar was in pain.  Deputy Ruiz asked Aguilar his name, and had a brief conversation with Aguilar in order to obtain a description of the suspect.  Aguilar told Deputy Ruiz that he was walking with a friend westbound on 106th Street when two Hispanic men in a red car drove by, asked what barrio they were from, fired two to three shots at them, and that one shot hit Aguilar in the knee.  (See 4 RT 553-57).

2.   Legal authority

A primary interest secured by the Confrontation Clause of the Sixth Amendment is the right of an accused in a criminal prosecution to confront and cross-examine witnesses against him.  See Delaware v. Van Arsdall, 475 U.S. 673, 678, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); Davis v. Alaska, 415 U.S. 308, 315, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).  In Crawford v. Washington, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Supreme Court set forth a new rule for determining whether the admission of out-of-court statements constituted a Confrontation Clause violation:  "Where testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."  Although the Supreme Court did not define "testimonial," examples of testimonial statements included the following: (1) ex parte in-court testimony, affidavits, custodial examinations, and prior testimony; (2) "pretrial statements that declarants would

20

1  reasonably expect to be used prosecutorially"; (3) "formalized" materials like

2  depositions and confessions; and (4) "statements that were made under circumstances

3  which would lead an objective witness to reasonably believe that the statement would be

4  available for use at a later trial." See id. at 51-52. The Supreme Court also stated that

5  "prior testimony at a preliminary hearing, before a grand jury, or at a former trial", and

6  statements made during a police interrogation were testimonial. See id. at 68.

7       The Supreme Court provided additional guidance on what qualifies as

8  "testimonial" in Davis v. Washington, 547 U.S. 813,  126 S.Ct. 2266, 2274-75, 165

9  L.Ed.2d 224 (2006):

10          "Statements are nontestimonial when made in the course of police

11      interrogation under circumstances indicating that the primary purpose of the

12      interrogation is to enable police assistance to meet an ongoing emergency.  They

13      are testimonial when the circumstances objectively indicate that there is no such

14      ongoing emergency, and that the primary purpose of the interrogation is to

15      establish or prove past events potentially relevant to later criminal prosecution."

16

17       In Davis, the Supreme Court found that a domestic disturbance victim's statements

18  to a 911 operator were nontestimonial for the following reasons: the caller was speaking

19  about events as they were actually happening (rather than describing past events); a

20  reasonable listener would realize that the caller was facing an ongoing emergency; the

21  nature of what was asked and answered was such that the elicited statements were

22  necessary to be able to resolve the present emergency (rather than to learn what had

23  happened in the past); and the caller gave frantic answers over the phone in an

24  environment that was not tranquil or even safe. See id. at 2276-77.[15]

25       However, in Hammon v. Indiana, a case consolidated with Davis, the Supreme

26  Court found that a domestic disturbance victim's at-the-scene statements to a police

27  _____

28  [15]    The Supreme Court cautioned that a witness' statements may become
    testimonial in nature once the emergency has ended. See id. at 2277.

1  officer (the victim filled out and signed an affidavit) were testimonial for the following
2  reasons: the interrogation was part of an investigation into possibly criminal past conduct
3  (as the testifying officer expressly acknowledged); there was no emergency in progress
4  (the officer was seeing determine "what happened"); and the primary, if not sole,
5  purpose of the interrogation was to investigate a possible crime. See id. at 2272-73,
6  2278-79.
7        Even where there is constitutional error, federal habeas relief is not warranted
8  unless the error had a "substantial and injurious effect or influence in determining the
9  jury's verdict." See Brecht v. Abrahamson, 507 U.S. 619, 637-38, 113 S.Ct. 1710, 123
10 L.Ed.2d 353 (1993); Lilly v. Virginia, 527 U.S. 116, 139-40, 119 S.Ct. 1887, 144
11 L.Ed.2d 117 (1999).
12
13        3.    California Court of Appeal decision
14        The California Court of Appeal rejected petitioner's Sixth Amendment claim as
15 follows:
16            "[Petitioner] argues Aguilar's statement to Deputy Ruiz was in response to
17        police interrogation or its equivalent and therefore was testimonial in that an
18        objective witness reasonably would have believed the statement would be
19        available for use in a later trial. (Crawford v. Washington, supra, 541 U.S. at p.
20        51.) [Petitioner] also asserts a reasonable person in Aguilar's position would have
21        had time to reflect and make a self-serving statement, thereby suggesting Aguilar
22        spoke in anticipation of a later court hearing.
23            The question whether statements made by an ostensible crime victim to a
24        police officer in response to general investigative questioning are testimonial
25        under Crawford is pending before the California Supreme Court in numerous
26        cases, many of which involved statements made during a 911 call.
27            Pending further elucidation on this point by either the California or the
28        United States Supreme Court, it appears Aguilar's spontaneous statement to

22

1   Deputy Ruiz was not the product of a police interrogation as that term is used in
2   *Crawford* because the encounter was unstructured and bore "no indicia common to
3   the official and formal quality of the various statements deemed testimonial by
4   *Crawford.*" (*People v. Corella* (2004) 122 Cal.App.4th 461, 468.) As noted in
5   *Corella*, "Preliminary questions asked at the scene of a crime shortly after it has
6   occurred do not rise to the level of an interrogation." Such an unstructured
7   interaction between officer and witness bears no resemblance to a formal or
8   informal police inquiry that is required for a police 'interrogation' as that term is
9   used in *Crawford*. [Citation]" (*Id.* at p. 469.)

10       Further, in *Corrella*, as here, the statement at issue was admissible under the
11   spontaneous declaration exception to the hearsay rule which requires the utterance
12   "be made without reflection or deliberation due to the stress of excitement"
13   (*People v. Corella, supra,* 122 Cal.App.4th at p. 469.) Such a statement, by
14   definition, is not made in contemplation of later use at a trial and therefore is not
15   testimonial. (See *Crawford v. Washington, supra,* 541 U.S. at p. 51; *People v.*
16   *Corella, supra,* at p. 469.)

17       We conclude that under the circumstances, Aguilar spoke to Deputy Ruiz
18   without considering the possible use of his statement at a future trial. As *Corella*
19   observed, Aguilar's spontaneous statement about a traumatic event that took place
20   only a few minutes earlier did not become the product of a police interrogation
21   simply because an officer received the information. (See *People v. Corella, supra,*
22   122 Cal.App.4th at p. 469)." (Lodgment "G" at 6-7)(footnote omitted).

23
24       4.   Findings and conclusion
25       Here, the Court agrees with the California Court of Appeal's conclusion that
26   Aguilar's statements to Deputy Ruiz were nontestimonial. Aguilar's statements, made
27   shortly after the shooting, did not resemble the type of statements <u>Crawford</u> considered
28   testimonial, i.e., "formal" testimony, reasonably expected to be used prosecutorially, or

23

1   reasonably believed would be be available for use at a later trial. See Crawford, supra,

2   541 U.S. at 51-52, 68. Moreover, since Aguilar's statements were elicited in response to

3   the Deputy Ruiz' attempts to obtain a description of the armed suspects who had just fled

4   the scene (see 4 RT 396, 555), his statements more closely resemble the "present

5   emergency" statements in Davis than the "past emergency" statements in Hammon).

6         Finally, even assuming arguendo that the California Court erred in finding that

7   Aguilar's statements to Deputy Ruiz were nontestimonial, and even if the admission of

8   such evidence amounted to a federal constitutional violation as a matter of clearly

9   established Supreme Court law, the Court finds that the constitutional error did not have

10  a "substantial and injurious effect or influence in determining the jury's verdict." See

11  Brecht, supra. There was substantial evidence, beyond Aguilar's statements to Deputy

12  Ruiz, of petitioner's involvement in the gang-related shootings of Aguilar and Morales ,

13  including the following:  Reynoso saw two Hispanic men in a red car approaching

14  Aguilar and Morales, saw the passenger shooting at Aguilar and Morales from a close

15  distance, and heard the two men laughing as they drove away (see 4 RT 431-37, 474);

16  Morales told the police that two Hispanic men in a red car approached him and a friend,

17  and shot two or three times at him (see 4 RT 562-63; 5 RT 607-08); Mendoza told the

18  police that two or three shots were fired (see 5 RT 606-08); shortly after the incident,

19  petitioner exited the red car and attempted to flee (see 4 RT 440-42; 481-95, 500, 520-

20  22; 5 RT 598-99); petitioner hid in the attic of a motel room; after petitioner was

21  apprehended, the police recovered bullets in the attic that matched the caliber of the

22  bullets found at the shooting scene and in the red car (see 4 RT 494-95, 501, 560-61,

23  565-70; 5 RT 575-78, 606, 615-29); the majority of bullets recovered in the motel room

24  attic had the same stamp as the expended shell casing recovered from the red car (see 5

25  RT 576-79, 649-51, 673-74); and petitioner and Vasquez, both members of a Lennox 13

26  gang, obtained a stolen car, drove to the heart of Tepa 13 territory, and fired at Aguilar

27  and Morales, both members of  the rival Tepa 13 gang (see 4 RT 431-37, 474-76, 524-

28  26, 529, 539-40, 543, 562-63; 5 RT 606-08, 663-72, 678-83, 691, 700, 713-21, 725-26).

1    Accordingly, the Court finds and concludes that the California courts' rejection of

2 petitioner's evidentiary error claim neither was contrary to nor involved an unreasonable

3 application of clearly established federal law, as determined by the United States

4 Supreme Court.

5

6 **C.    Habeas relief is not warranted with respect to petitioner's ineffective**

7    **assistance of trial counsel claim.**

8    In <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674

9 (1984), the Supreme Court held that there are two components to an ineffective

10 assistance of counsel claim: "deficient performance" and "prejudice."

11    "Deficient performance" in this context means unreasonable representation falling

12 below professional norms prevailing at the time of trial. <u>See</u> <u>Strickland</u>, 466 U.S. at 688-

13 89. To show "deficient performance," petitioner must overcome a "strong presumption"

14 that his lawyer "rendered adequate assistance and made all significant decisions in the

15 exercise of reasonable professional judgment." <u>See</u> 460 U.S. at 690. Further, petitioner

16 "must identify the acts or omissions of counsel that are alleged not to have been the

17 result of reasonable professional judgment." <u>Id.</u> The Court must then "determine

18 whether, in light of all the circumstances, the identified acts or omissions were outside

19 the range of professionally competent assistance." <u>Id.</u>

20    To meet his burden of showing the distinctive kind of "prejudice" required by

21 <u>Strickland</u>, petitioner must affirmatively "show that there is a reasonable probability that,

22 but for counsel's unprofessional errors, the result of the proceeding would have been

23 different. A reasonable probability is a probability sufficient to undermine confidence in

24 the outcome." <u>Strickland</u>, 466 U.S. at 694; <u>see also</u> <u>Williams</u>, 529 U.S. at 390-91.

25    Petitioner contends that his trial counsel was ineffective for failing to challenge

26 the jury venire consisting of an under-representation of Hispanic-Latino potential jurors.

27 Petitioner claims that, although almost fifty percent of the population in Los Angeles

28 County is Hispanic-Latino, there were only five Hispanic-Latinos in the jury venire.

25

1 (Petition at 7, Attachment No. 4 at 15-18).

2      The Sixth Amendment right to a jury trial includes a right to a jury drawn from "a
3 representative cross section of the community." Taylor v. Louisiana, 419 U.S. 522, 528,
4 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). However, the Supreme Court explained in Taylor
5 that it was imposing "no requirement that petit juries actually chosen must mirror the
6 community and reflect the various distinctive groups in the population." See id. at 538.
7 "Defendants are not entitled to a jury of any particular composition." Id.

8      The Supreme Court has developed a three-part test to determine whether a prima
9 facie violation of the representative cross-section requirement has been established. The
10 defendant must show: (1) that the group alleged to be excluded is a "distinctive" group in
11 the community; (2) that the representation of this group in venires from which the juries
12 are selected is not fair and reasonable in relation to the number of such persons in the
13 community; and (3) that this underrepresentation is due to systematic exclusion of the
14 group in the jury selection process. See Duren v. Missouri, 439 U.S. 357, 364, 99 S.Ct.
15 664, 58 L.Ed.2d 579 (1979); see also Randolph v. California, 380 F.3d 1133, 1140 (9th
16 Cir. 2004).

17      Here, petitioner merely alleges that there were no more than five Hispanic-Latino
18 potential jurors in the jury venire, and that no Hispanic-Latino potential juror was asked
19 questions during voir dire (petitioner admits that one potential juror claimed to speak
20 Spanish and that one potential juror had a Hispanic-Latino surname). While Hispanic-
21 Latinos are a "distinctive" group in the community, petitioner has failed to address the
22 second and third prongs of the Duren test. Petitioner has failed to present any evidence
23 showing that the representation of Hispanic-Latinos in Los Angeles County venires from
24 which juries were selected was not fair and reasonable in relation to the number of
25 Hispanic-Latinos in the community. Petitioner also has failed to present any evidence
26 showing that the disparity of Hispanic-Latinos in the venire was due to "systematic
27 exclusion of the group in the jury-selection process." See Duren, supra, 439 U.S. at 364;
28 see also Randolph, supra, 380 F.3d at 1141 ("Under the test established by Duren,

26

1   disproportionate exclusion of a distinctive group from the venire need not be intentional

2   to be unconstitutional, but it must be systematic.").

3          Thus, petitioner has failed to meet his burden of showing that there is a reasonable

4   probability that, but for his trial counsel's failure to object to the composition of the jury

5   venire on the grounds proffered by petitioner, the result of his trial would have been

6   different.  The Court's finding that petitioner has failed to make the requisite showing of

7   "prejudice" renders it unnecessary to address <u>Strickland</u>'s "deficient performance"

8   prong.  <u>Strickland</u>, <u>supra</u>, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness

9   claim on the ground of lack of sufficient prejudice, ... that course should be followed.");

10  <u>see also</u> <u>Williams v. Calderon</u>, 52 F.3d 1465, 1470 n.3 (9th Cir. 1995), <u>cert.</u> <u>denied</u>, 516

11  U.S. 1124 (1996).

12         Accordingly, the Court finds and concludes that the California courts' rejection of

13  petitioner's ineffective assistance of trial counsel claim neither was contrary to nor

14  involved an unreasonable application of clearly established federal law, as determined by

15  the United States Supreme Court.

16

17  **D.      Habeas relief is not warranted with respect to petitioner's ineffective**

18          **assistance of appellate counsel claim**.

19         Petitioner contends that his appellate counsel was ineffective for failing to request

20  the venire jurors' questionnaires to identify potential jurors' surnames.  According to

21  petitioner, his appellate counsel's failure prevented him from supporting his claim that

22  there was an under-representation of Hispanic-Latino potential jurors in the jury venire.

23  (Petition at 8, Attachment No. 4 at 18-19).

24         The <u>Strickland</u> standard also applies to claims of ineffective assistance of appellate

25  counsel.  <u>See</u> <u>Smith v. Robbins</u>, 528 U.S. 259, 285, 120 S.Ct. 746, 145 L.Ed.2d 756

26  (2000); <u>Smith v. Murray</u>, 477 U.S. 527, 535-36, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986).

27         A habeas petitioner must show that, but for appellate counsel's failure to raise the

28  omitted claim(s), there is a reasonable probability that the petitioner would have

27

1   prevailed on appeal. In the absence of such a showing, neither <u>Strickland</u> prong is
2   satisfied. <u>See</u> <u>Pollard v. White</u>, 119 F.3d 1430, 1435-37 (9th Cir. 1997); <u>Miller v.</u>
3   <u>Keeney</u>, 882 F.2d 1428, 1434-35 (9th Cir. 1989).

4        Even if the venire jurors' questionnaires had allowed appellate counsel to
5   determine the number of Hispanic-Latino potential jurors on the jury venire, petitioner
6   has failed to present any evidence addressing the second and third prongs of the <u>Duren</u>
7   test, as discussed above. Therefore, petitioner has failed to show that, but for his
8   appellate counsel's failure to request the venire jurors' questionnaires, there is a
9   reasonable probability he would have prevailed on appeal.

10       Accordingly, the Court finds and concludes that the California courts' rejection of
11   petitioner's ineffective assistance of appellate counsel claims neither was contrary to nor
12   involved an unreasonable application of clearly established federal law, as determined by
13   the United States Supreme Court.

14

15   **E.    <u>Petitioner's sentencing error claim is not cognizable on federal habeas review</u>.**
16       Petitioner contends that the trial court erred in staying rather than striking the
17   firearm enhancements under California Penal Code §§ 12022.53(b) and (c). According
18   to petitioner, the firearm enhancements are duplicative and therefore should have been
19   stricken. (Petition at 7, Attachment No. 3 at 19-21; <u>see</u> CT 279, 289-90; 6 RT 998-90).
20       Petitioner's sentencing error claim involves solely the interpretation and/or
21   application of state sentencing law and, as such, are not cognizable on federal habeas
22   review. <u>See</u>, <u>e.g.</u>, <u>Christian v. Rhode</u>, 41 F.3d 461, 469 (9th Cir. 1994); <u>Cacoperdo v.</u>
23   <u>Demosthenes</u>, 37 F.3d 504, 507 (9th Cir.), <u>cert. denied</u>, 514 U.S. 1026 (1995); <u>Hendrick</u>
24   <u>v. Zenon</u>, 993 F.2d 664, 674 (9th Cir. 1993); <u>see also</u> <u>Estelle. v McGuire</u>, 502 U.S. 62,
25   67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)(reiterating that "it is not the province of a
26   federal habeas court to reexamine state court determinations on state law questions").
27   The Court notes that the California Court of Appeal rejected petitioner's sentencing error
28   claim on state law grounds only. (<u>See</u> Lodgment "G" at 16-17).

28

# VII.  RECOMMENDATION

For the reasons discussed above, it is recommended that the court issue an Order: (1) approving and accepting this Report and Recommendation; (2) directing that Judgment be entered dismissing the action with prejudice.

DATED: _2/7/08_

_Stephen J. Hillman_
STEPHEN J. HILLMAN
United States Magistrate Judge

## NOTICE

Reports and Recommendations are not appealable to the Court of Appeals, but may be subject to the right of any party to file Objections as provided in the Local Rules Governing the Duties of the Magistrate Judges and review by the District Judge whose initials appear in the docket number.  No Notice of Appeal pursuant to the Federal Rules of Appellate Procedure should be filed until entry of the Judgment of the District Court.